**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**HERBERT D. YORK,**

      **Plaintiff,**

**v.**                                **Case No. 3:10-CV-920-J-32TEM**

**FELICIA D. CHESTNUT, et al.,**

      **Defendants.**

_____/

## DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Defendants Felicia Chestnut, Philip Christie, Joshua Harris, Jesse Kelly and Jonathan Nash, through undersigned counsel, hereby move for dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56(b).  In support, Defendants submit the following:

## PRELIMINARY STATEMENT

Plaintiff, Herbert York ("York"), is an inmate in the custody of the Florida Department of Corrections ("Department") with an extensive disciplinary history that includes reports of disorderly conduct, spoken threats, assault, disobeying orders, arson, and destruction of state property.  (Exhibit A)  York also has a documented history of getting out of or manipulating his restraints, both prior to and after the use of force at issue in this case.  (Exhibit B)  York is currently incarcerated at Union Correctional Institution ("CI").  (Exhibit A)  At all times relevant to the Complaint, Defendants Captain Chestnut, Officer Nash, Officer Kelly, Officer Harris and Officer Christie were employed by the Department in various positions at Union CI.  Plaintiff

1

sues the Defendants in their individual and official capacities.  (Doc. 28 at 1)  York filed suit on October 5, 2010, under Section 1983, alleging that the Defendants violated his Eighth Amendment rights by using cruel and unusual punishment against him.  (Doc. 1)  York filed his Amended Complaint on April 14, 2011.  (Doc. 28)

## PLAINTIFF'S ALLEGATIONS

1.      According to the Amended Complaint (Doc. 28) and York's deposition, York's allegations are as follows:  Prior to October 14, 2008, York claims he made several complaints concerning staff misconduct, which resulted in staff, including the Defendants "being begrudged against" him.  (Doc. 28 at 9; Exhibit C at 12)  York also claims he filed a lawsuit in August 2008 which named Captain Chestnut and Officer Harris as defendants and suggests the lawsuit is a reason they would attack him.  (Exhibit C at 12, 32-33)  York states the lawsuit was not served on anyone, but unnamed officers searched his room and read the mail and found out about the lawsuit.  (Id.)

2.      On October 14, 2008, between approximately 6:00 a.m. and 7:30 a.m., Officers Nash and Kelly came to York's cell and asked if he wanted to attend his mental health group callout.  (Doc. 28 at 9; Exhibit C at 2)  York said he would attend and Officers Nash and Kelly placed him leg irons, handcuffed him behind his back, and secured a chain around his waist to his wrists with a black box device.  (Id.)

3.      Before York exited his cell, Officer Nash smiled and said, "Don't worry. You're not going very far," and Officers Nash and Kelly then escorted Plaintiff off the wing.  (Doc. 28 at 9; Exhibit C at 3)  When York exited the wing and was approaching the stairs, Officer Christie approached and said, "Hi York.  I see your black ass likes filing grievances and lawsuits on my coworkers."  (Id.)

2

4.      At this point, Officer Christie was coming from the stairwell area and was in an area known as the quarterdeck, positioned face to face with York.  (Exhibit C at 15-17, 19)  The door to the room where mental health callouts are held was on York's right side and Officer Christie's left side.  (Id. at 19, 20)  Officer Christie then reached around and grabbed York with his left hand on the back of York's shirt collar, opened the door with his right hand, and shoved York inside the room.  (Doc. 29 at 10, Exhibit C at 3-4, 17-19, 21, 23-24)  York first stated the door knob was on the right side of the door, and then changed his testimony and stated it was on the left.  (Exhibit C at 22, 33)  Either way, the door pulled open outwards, rather than pushing open inwards.  (Id. at 4)  After Christie shoved him inside, York hit the right wall and fell to the floor on his back and side.  (Id. at 5)  Officers Christie, Harris, Nash and Kelly then entered the room and began punching and kicking York in the face, back and chest and hitting York's head with their radios.  (Id. at 5-6)  The beating lasted for approximately eight minutes.  (Id. at 7)  The door to the room where this incident occurred remained open the entire time.  (Id. at 7-8)  Captain Chestnut then entered the room and kicked York three, four or five times in the face "very hard," with the last kick rendering him unconscious.  (Id. at 8)  York came to in the downstairs holding cell.  (Id.)  York claims that at no time during the alleged assault did he threaten or attempt to attack the Defendants.  (Doc. 28 at 10)

5.      Following this incident, York alleges he was assessed by Nurse Wilson and then received further treatment in the Urgent Care Annex.  (Id.)  York states he received three sutures above his left eyelid and to the right side of his head.  (Id. at 11)  York further states he sustained multiple facial lacerations, suffered bruised and swollen eyes, as well as other facial swelling.  (Id.)  York claims he was knocked unconscious and experienced debilitating physical pain and suffering after the alleged assault.  (Id.)

6.      York alleges that Captain Chestnut told the doctor, "We have to hide this inmate until he heals up," which lead the doctor to keep him overnight in the prison hospital.  (Id.)  In addition, York alleges that he submitted numerous inmate sick-call request forms seeking further medical treatment following this incident, but that further medical assessment or treatment "was not forthcoming."  (Id. at 12)  York also claims that the majority of his personal records concerning this incident were destroyed or thrown away by unidentified prison guards.  (Id.)

7.      Further, York alleges that Officers Christie and Nash threatened to "beat Plaintiff to death" if he continued filing grievances or a lawsuit.  (Id. at 13)  Captain Chestnut also allegedly threatened York, stating, "Inmate, you submit another inmate grievance, or see or talk to anyone else about this incident, I will personally give the order for my Officers to beat you down again!"  (Id.)

8.      York claims he received two Disciplinary Reports ("DRs") as a result of this incident, one for Assault and one for Disobeying an Order.  (Id. at 12)  York states that the charges were delivered to him, but no one ever came to get him for his DR hearings.  (Exhibit C at 13-14)  York claims officers falsely stated he refused to attend his DR hearings.  (Id.)  York stated he lost "a lot" of gain time due to these infractions.  (Id. at 14)

9.      York is suing the Defendants in their official capacities for injunctive relief and in their individual capacities for damages.  (Doc. 28. at 8)  York seeks appointment of counsel, compensatory and punitive damages, nominal damages, costs and unspecified injunctive relief.  (Id. at 14)

## DEFENDANTS' STATEMENT OF THE RULE 56(e) MATERIAL FACTS

*Lawsuits Filed by Herbert York Prior to October 2008*

1.      Prior to the use of force at issue in this case, York filed one federal case in the Middle District of Florida, case no. 3:08-cv-00945-TCJ-JRK, filed October 1, 2008.  (Exhibit R – Docket Sheet)  Captain Chestnut and Officer Harris are among the defendants named in the case.  (Id.)  The case was dismissed on August 21, 2009.  (Id.)  The complaint was never served on any of the defendants.  (Id.)

*Spontaneous Use of Force on October 14, 2008*

2.      On October 14, 2008, Officers Christie, Harris, Nash and Kelly were all assigned during the administrative shift to work at O-dorm at Union CI.  (Exhibits D, E, F & G – Affidavits of Defendants Christie, Harris, Nash and Kelly)  At the beginning of the shift, which at that time ran from 7:00 a.m. to 4:00 p.m., Officers Nash and Kelly were pulling inmates from wing 2 who were scheduled to participate in mental health groups.  (Exhibits F & G)  At approximately 7:40 a.m., Officers Nash and Kelly pulled inmate York from his second floor cell after handcuffing him in front.  (Id.)  Officers Nash and Kelly applied leg irons to York and escorted him off the wing toward the quarterdeck.  (Id.)

3.      At this same time, Officers Christie and Harris had just returned to the second floor from the downstairs of O-dorm, when Officers Kelly and Nash approached with inmate York and turned right into the quarterdeck area near the stairwell.  (Exhibits D, F & G) Officers Nash and Kelly asked Officers Christie and Harris to take York downstairs while they continued pulling inmates out of their cells.  (Exhibit D)

4.      Before Officers Christie and Harris could even take over the escort, inmate York said, "Fuck you, white boy," to Officer Harris and suddenly lunged forward, attempting to head

butt him.  (Exhibits D, E, F, G & H – Declaration of Deandra Robinson)  Officer Christie quickly pinned York against the upstairs conference room door and ordered him to cease his assaultive behavior.  (Exhibits D, E, F & H)  York refused the order and continued to struggle.  (Exhibits D & E)  York shouted, "I will kill all you fucking crackers!"  (Exhibit D)  At this point, Officer Harris assisted Officer Christie in holding York against the door.  (Exhibits D, E & F)  York continued to refuse orders to stop resisting and began twisting his upper body in an attempt to break Officers Christie and Harris' hold on him.  (Exhibits D & E)

5.      While York was still pinned to the door, Officer Christie attempted to grasp York's left hand, which was cuffed in front.  (Exhibits D, F & G)  Officer Christie's hand slipped off of York's hand, due to an unknown slippery substance present on York's skin.  (Exhibit D)  Officer Christie felt the unknown substance all the way to York's upper forearms and could tell it was not sweat.  (Id.)  Officer Christie adjusted his hold on York and held him by the left shoulder instead.  (Id.)  York continued resisting and twisting his body, trying to pull away from Officers Christie and Harris.  (Id.)

6.      At this point, York attempted to head butt Officer Harris a second time.  (Exhibits D & E)  Officers Christie and Harris forced York to the quarterdeck floor, facedown, in order to prevent further assault.  (D, E, F, G & H)  Officer Christie again ordered York to cease his disruptive behavior; York refused.  (Exhibit D)  York continued to struggle and resist by twisting his upper body.  (Id.)  Once York became compliant, Officers Christie and Harris assisted him to his feet.  (Exhibits D & E)  York continued resisting and began shouting, "Fuck y'all!"  (Id.)  Officers Christie and Harris again forced York facedown on the floor.  (Exhibits D, E & H)  Once York ceased his disruptive behavior, Officers Christie and Harris assisted York to his feet again.  (Id.)

6

7.      Officers Christie and Harris and inmate York had now reached the top of the stairs.  (Exhibits D & E)  The stairwell is narrow, measuring approximately 3½ to 4 feet wide.  (Id.)  The stairs are closed off by a wall on one side and there is an open railing that looks over the first floor on the left side.  (Id.)  The stairwell is just wide enough for one officer to maneuver the stairs alongside an inmate.  (Id.)  Any other officers would have to be in front or behind the inmate.  (Id.)  The stairs themselves are coated with a non-skid material that is rough to the touch and similar to sandpaper.  (Id.)

8.      Because York appeared compliant at the top of the stairs, Officer Christie ordered him to begin walking downstairs.  (Exhibits D & E)  York started forward as if to comply, but suddenly snatched away and tried to head butt Officer Harris a third time.  (Id.)  Officer Christie grabbed York's upper left arm, but he snatched away again, apparently losing his balance, and fell down the stairs, where he rolled to a stop on the top stairwell landing.  (Exhibits D, E, F, H & H)  York's sudden snatching caused Officer Harris to lose his balance as well, but he was able to catch himself on the wall opposite the stairs with both arms extended out in front of him.  (Exhibits D & E)  Officer Christie also lost his balance on the stairs, but was able to avoid falling by grabbing onto the upper rail.  (Exhibit D)

9.      By the time Officer Harris regained his balance, Officer Christie had already reached the first landing.  (Exhibits D & E)  After the fall, York was positioned against the wall opposite the first set of stairs down to the landing and his head and part of his upper body were slightly down the next set of stairs leading to the second landing below.  (Id.)  Officers Christie and Harris went partway down the second set of stairs and brought York to his feet on the first landing.  (Id.)

10.     While still on the top landing, York refused orders to walk down the rest of the stairs and stated, "Y'all are gonna have to kill me." (Exhibits D & E)  York again tried to break free from Officers Christie and Harris by twisting his upper body.  (Id.)  Officers Christie and Harris forced York facedown on the stairwell landing floor in an effort to regain control over him.  (Id.)  Once York became compliant, Officers Christie and Harris assisted him to his feet and escorted him to the bottom of the stairs.  (Id.)  Once they reached the bottom of the stairs, Officer Christie released his hold and Officer Harris escorted York to the O-dorm first-floor holding cell.  (Id.)  Officer Harris placed York on the holding cell bench and exited the cell.  (Id.)  No further force was used.  (Id.)

11.     Officers Kelly and Nash were present during York's initial attempt to head butt Officer Harris and witnessed the entire use of force, but did not participate in any way.  (Exhibits D, E, F, G, H & K)

12.     Officer Deandra Robinson was assigned to the upstairs control room in O-dorm during this incident.   (Exhibit H)   The control room is located directly across from the conference room and stairwell area where this incident occurred.  (Id.)   Officer Robinson witnessed York lunge at and attempt to head butt Officer Harris.  (Id.)   Officer Robinson also witnessed Officers Christie and Harris hold York against the conference room door.  (Id.)  York continued to struggle, and Officer Robinson witnessed Officers Christie and Harris force York to the floor in order to calm him down.  (Id.)   Once the officers resumed the escort, Officer Robinson observed York jerking, pulling and otherwise being belligerent.  (Id.)  By the stairwell, Officer Robinson saw York lunge at Officer Harris again, continue to struggle with the officers, and then fall down to the landing.  (Id.)

8

13.     Captain Chestnut (then Lieutenant) was not present during the use of force. (Exhibits D, E, F, G, H & J)  Captain Chestnut was notified of the incident because she was the Officer in Charge at the time the spontaneous use of force occurred.  (Exhibits J & K)  Captain Chestnut instructed Officers Keith Cavanagh, Joshua Olive, and Bennie Harper to assist in the escort of inmate York from the O-Dorm downstairs holding cell to the Urgent Care Area. (Exhibit J)  Captain Chestnut also instructed Officer David Zwicker to videotape the post use of force physical of inmate York.  (Id.)

14.     Captain Chestnut arrived at the downstairs holding cell in O-Dormitory at approximately 7:48 a.m. and was present for York's medical assessment by Nurse Sidra Wilson. (Id.)  Captain Chestnut was also present during his escort to the Urgent Care Area for sutures and for subsequent housing in the infirmary for observation.  (Id.)

15.     Officer Chestnut was told that during the use of force Officers Christie and Harris could not maintain their hold on York due to an unknown slippery substance present on York's skin.  (Id.)  After the use of force, a search was conducted of inmate York's cell to look for the slippery substance.  (Id.)  A cup of butter was found in York's cell.  (Id.)

16.     The following day, on October 15, 2008, York submitted a written witness statement outlining his version of events.  (Exhibit L)  York stated that on October 14, 2008, between 8:00 and 9:20 p.m., he was asked by Officers Nash and Kelly if he wanted to attend his callout and he stated that he did.  (Id.)  York alleged that once out of the range of the camera, he was met by Officer Christie, Sergeant Jenkins, and Officer Nash.  (Id.)  As York was walking toward the steps, Officer Christie stated, "O [sic] you like writing up civil cases, hum" and indicated this was for Lieutenant Chestnut.  (Id.)  Officer Christie then opened the "doctor door" where they have TCU callouts.  (Id.)  York claimed Officer Christie hit him in the back of the

9

head with his radio and that Officer Nash kicked him to the floor.  (Id.)  All the officers then took turns hitting York with their radios until he blacked out.  (Id.)  Sergeant Jenkins kicked York in the forehead.  (Id.)  York stated he could not see what else they were doing to him once he blacked out.  (Id.)  York alleged that Officer Christie threatened to do something to him because he wrote a grievance claiming Officer Christie beat an inmate named Darryl Streeter.  (Id.)  York stated that Lieutenant Chestnut was told about this incident.  (Id.)

***Medical Treatment Following the Use of Force***

17.     While still in the holding cell, York was provided a post use of force examination by Nurse Wilson.  (Exhibit M at 1)  She noted that York alleged staff abuse and claimed that Officers Christie and Nash pushed him inside the conference room and mashed his head.  (Id.)  Nurse Wilson noted that York had several injuries to his head and was complaining of pain all over.  (Id.)  York was referred to Urgent Care for further examination and treatment.  (Id.)

18.     York was escorted to Urgent Care and was assessed by Dr. Aviles at approximately 8:40 a.m. with the following injuries being noted: small scratches on right ankle from cuffs, small scratch on right wrist, multiple superficial scratches and lacerations to face with swelling, hematoma on forehead, swelling to right eye with inability to open on own, and two lacerations requiring sutures (one to the right crown and one to the left eyebrow).  (Id. at 1-2)  York received three sutures on each cut.  (Id.)  York refused bandages to his head.  (Id. at 1)  Dr. Aviles prescribed Keflex, an antibiotic, and Tylenol.  (Id. at 1, 3)  Dr. Aviles also recommended that York stay in the infirmary overnight for observation and requested that York receive a neurological check every shift.  (Id. at 1, 3, 8)

19.     The following day, October 15, 2008, York refused his neurological check and twice refused to take the antibiotics as prescribed.  (Id. at 9)  York refused to sign the Refusal of

Healthcare Services form, which was witnessed by Nurse Baker and Sergeant Schlipf.  (<u>Id.</u> at 9, 11)  It was also noted that York's lacerations and sutures were intact without drainage.  (<u>Id.</u> at 9)  No distress was noted.  (<u>Id.</u>)

20.    Later the same day, Dr. Aviles noted that York had swelling in both eyes with bruising, and again noted the presence of a hematoma on the forehead.  (<u>Id.</u> at 9)  Dr. Aviles noted that York was alert with full range of movement of his head and neck and had a normal gait.  (<u>Id.</u>)  York denied experiencing dizziness, headaches, or double vision and requested to be returned to his regular housing assignment.  (<u>Id.</u>)  Dr. Aviles discharged York from the infirmary later that day.  (<u>Id.</u>)

21.    On October 16, 2008, Nurse Wright attempted to examine York due to his claims of staff abuse.  (<u>Id.</u> at 12)  York refused to be seen, stating that he was already examined on October 14, 2008.  (<u>Id.</u>)  Nurse Wright noted the injuries that could be readily observed on York's person, but noted that a full assessment was impossible due to York's refusal.  (<u>Id.</u> at 12-13)  Again, York refused to sign the Refusal of Healthcare Services form, which was witnessed by Nurse Wright and Officer Borgner.  (<u>Id.</u> at 14)

22.    Nearly 10 months after this use of force occurred, x-rays were ordered of York's facial bones following a complaint of being hit on the left side of his face unrelated to the incident at issue in this case.  (<u>Id.</u> at 15-16)  The August 5, 2009, x-ray report evaluated York for the presence of fractures, bone displacement, or other osseous (bone) abnormalities.  (<u>Id.</u>)  The report reflects no bone or other abnormalities and notes only that York showed complete opacification of the left maxillary sinus.  (Exhibit M at 15; Exhibit N)  This means that York's sinus cavity was opaque on the x-ray, which is indicative of sinusitis.  (Exhibit N)

23.    Both Officers Christie and Harris received post use of force examinations on October 14, 2008.  (Exhibit M at 4-7)  No injuries or complaints were noted by either officer.  (Id.)

***Disciplinary Action***

24.    As a result of his actions on October 14, 2008, York received two disciplinary reports ("DRs") directly related to the claims raised in the Amended Complaint.  (Exhibit O)  The first DR was for Disobeying an Order, log number 213-082761, and was written by Officer Christie.  (Id. at 1)  The incident is described in the statement of facts as follows:

> At approximately 0740 hours, on Tuesday, October 14, 2008, while assigned as an administrative officer in the South East Unit, I was assisting in removing inmates from their cells for Mental Health Group, when I overheard inmate York, Herbert #B02769, housed in cell O2-212S, state to Officer Joshua Harris "Fuck you white boy," and then attempt to head butt him.  At this time force became necessary to prevent assault.  I ordered inmate York to cease his assaultive behavior, to no avail.  Inmate York shouted "I will kill all you fucking crackers!"  I again ordered inmate York to cease his disorderly behavior, to which he refused to comply.  Inmate York is being charged with 6-1 (disobeying a verbal order), rules of prohibited conduct.  This incident was referred to the shift supervisor for further disposition.

(Id.)  York refused to appear at his disciplinary hearing and refused to sign the Refusal to Appeal form.  (Id. at 1, 3)  York's refusal to sign the form was witnessed by Sergeant Snow on October 22, 2008.  (Id. at 3)  York was found guilty of the infraction and received 30 days in disciplinary confinement and no loss of gain time.  (Id. at 2)

25.    The second disciplinary report York received was for Attempted Assault on a Correctional Officer, log number 213-082762, due to York's attempt to head butt Officer Harris.  (Id. at 4)  The incident is described in the statement of facts as follows:

> At approximately 0740 hours, on Tuesday, October 14, 2008, while assigned as an administrative officer in the South East Unit, I was assisting in removing inmates from their cells for Mental Health Group, when inmate York, Herbert #B02769, housed in cell O2-212S, stated "Fuck you white boy," and then attempt to head butt me. At this time force became necessary to prevent assault. Inmate York is being charged with 1-19 (attempted assault on a correctional officer), rules of prohibited conduct. This incident was referred to the shift supervisor for further disposition.

(<u>Id.</u>) York refused to appear at his disciplinary hearing and refused to sign the Refusal to Appear form. (<u>Id.</u> at 4, 6) York's refusal to sign the form was again witnessed by Sergeant Snow on October 22, 2008. (<u>Id.</u> at 6) York was found guilty of the infraction and received 60 days in disciplinary confinement and no loss of gain time. (<u>Id.</u> at 4)

***Plaintiff's Excessive Force Claim – Inspector General's Investigation***

26.     As a result of Plaintiff's claims of excessive use of force, an investigation was conducted by Investigator Kevin Snow of the Inspector General's Office. (Exhibit K) Inspector Snow's investigation concluded that force was necessary due to the York's actions and that the forced used by Officer Christie and Officer Harris to control York's assaultive behavior was not excessive. (<u>Id.</u> at 1) While York sustained injuries during this incident, Inspector Snow found that they were consistent with the type and amount of force used, particularly in light of York's fall down the stairs. (<u>Id.</u>) All witnesses denied that excessive force was used on the Plaintiff or that any part of this incident occurred in the conference room as alleged. (<u>Id.</u>)

27.     In addition, Inspector Snow found York's allegations against Captain Chestnut, Officer Nash and Officer Kelly to be unsubstantiated. (<u>Id.</u> at 2) Captain Chestnut reported she was not present for the use of force and denied kicking York in the head. (<u>Id.</u>) Captain Chestnut's absence was further supported by Officer Christie, Officer Harris, Officer Kelly, Officer Nash, Officer Zwicker, and Officer Robinson, none of whom reported that Lieutenant

Chestnut was present.  (Id.)  Further, none of the above-named witnesses reported that Officers

Nash or Kelly participated in the incident.  (Id.)

28.     Finally, Inspector Snow noted that York gave inconsistent accounts of who used

force on him and the type and amount of force used in his written witness statement and in his

sworn, recorded interview.  (Id.)  In his written statement, Plaintiff alleged he was being taken

off the wing by Officers Nash and Kelly, but once out of camera range Officer Christie said he

liked to write up civil cases on Lieutenant Chestnut.  (Exhibits K & L)  The officers then took

York into the room where TCU callouts take place[1] and Officer Christie hit him in the head with

his right hand, which had a radio in it.  (Id.)  York then alleged Officer Nash kicked him to the

floor where he was hit with radios by Sergeant Jenkins, Officer Nash, and Officer Christie until

he blacked out.  (Id.)  York also said Sergeant Jenkins kicked him in the forehead.  (Id.)

29.     In his sworn, recorded interview with Inspector Snow, taken on November 19,

2008, York stated that Officers Nash and Kelly escorted him off the wing for a psychology

callout, but when they got to the conference room door, Officer Christie opened the door,

grabbed him by his collar and threw him into the wall.    (Exhibits K & P)  Officers Kelly,

Christie and Nash then punched and hit Plaintiff in the head with their radios for five minutes.

(Id.)   Plaintiff then alleged that Lieutenant Chestnut came in and kicked him once in the

forehead, at which point he was knocked out.  (Id.)  Plaintiff claimed the excessive forced

incident occurred because an unnamed officer found "lawsuit paperwork" in his cell and because

---

[1] This room, also referred to as the "conference room" by many of the Defendants, is a multipurpose room on the
second floor of O-dorm across from the officer's station.  (Exhibit H)  It is often used for disciplinary or close
management hearings.  (Exhibit I)  The conference room is set up so that when you walk in the door, there is a wall
immediately to the right of the door and the room extends out to the left.  (Id.)  There is a large table that takes up
the majority of the room.  (Id.)  There is just enough space on either of the long sides of the table for some chairs
where the Institutional Classification Team or the Disciplinary Team sits during hearings.  (Id.)  The inmate usually
stands in the corner by the doorway.  (Id.)

Plaintiff wrote grievances on Officer Christie and Lieutenant Chestnut.  (Id.)  Plaintiff initially denied having any type of lubricant on his skin, but then admitted that he had grease on his hair, face and skin.  (Id.)

***Plaintiff's Account of the Incident in a Formal Grievance***

30.     In a formal grievance dated October 17, 2008, three days after the use of force at issue in this case, York described the incident as follows:  On October 14, 2008, at about 8:00 a.m. or 9:00 a.m., Officers Nash and Kelly told York he had a callout and pulled him from his cell.  (Exhibit Q)  As they reached the quarterdeck area in front of the control room, Officer Nash stated, "We have a surprise for you!" and smiled devilishly.  (Id.)  As York approached the stairs, Officer Christie grabbed York's collar and said, "Oh, you like to file lawsuits against my coworkers, huh?"  (Id.)  Officer Christie pushed York into an unlit room where psych interviews are held.  (Id.)  Officer Christie then slammed his radio into York's head, then pushed him against the wall causing him to fall face down on the floor.  (Id.)  York was beaten by Officers Christie, Nash, Kelly, and others for five minutes before he was knocked out.  (Id.)  York awoke in the sallyport with numerous facial injuries.  (Id.)

## MEMORANDUM OF LAW

### I.     Defendants are entitled to Eleventh Amendment immunity.

To the extent that Plaintiff is suing the Defendants in their official capacity, the Defendants invoke Eleventh Amendment immunity.  A suit against a state employee in an official capacity is a suit against the State for Eleventh Amendment purposes. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  In the absence of any waiver or express congressional authorization, which is not present in this case, the Eleventh Amendment prohibits a suit against a state in federal court.  Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985).

Congress did not intend to abrogate a state's Eleventh Amendment immunity in § 1983 damage suits. <u>Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490 (11th Cir. 1995). Florida has not waived its sovereign immunity nor consented to be sued in damage suits brought pursuant to section 1983. <u>See</u> <u>Gamble v. Florida Dep't of Health & Rehabilitative Servs.</u>, 779 F.2d 1509, 1513 (11th Cir. 1986). Florida has not waived its Eleventh Amendment immunity from suit in federal court. Fla. Stat. § 768.28(18).

## II.     Verbal abuse and threats are not cognizable under § 1983.

Plaintiff alleges that Defendants Christie and Nash threatened to beat Plaintiff to death if he continued filing grievances or a lawsuit. (Doc. 28 at 13) In addition, Plaintiff alleges that Defendant Chestnut threatened Plaintiff at an unspecified time following the use of force, stating "Inmate, you submit another inmate grievance, or see or talk to anyone else about this incident, I will personally give the order for my officers to bear you down again!" (<u>Id.</u>) These allegations fail to raise a claim under 42 U.S.C. § 1983. Verbal abuse, including threats, is not cognizable under 1983. <u>See</u> <u>Siglar v. Hightower</u>, 112 F.3d 191, 193 (5 Cir. 1997); <u>Keenan v. Hall</u>, 83 F.3d 1083, 1092 (9th Cir. 1996) (disrespectful and assaultive comments do not implicate the Eighth Amendment); <u>Gaut v. Sunn</u>, 810 F.2d 923, 925 (9th Cir. 1987) (mere threat does not constitute constitutional wrong). As such, any claim of a constitutional violation based on verbal abuse must be dismissed for failure to state a claim.

## III.    Plaintiff does not raise allegations against any named Defendant regarding his medical care claim or his claim that his property was taken from his cell.

Plaintiff alleges he submitted numerous sick call requests but did not receive further examination or treatment for his injuries. (Doc. 28 at 12) Plaintiff also alleges that may of his records related to this case were thrown away or destroyed by unspecified prison guards. (<u>Id.</u>)

However, Plaintiff does not allege that the Defendants somehow denied or prevented him from receiving care, nor does he have a medical defendant in this case.  (Doc. 28)  Plaintiff also does not make specific allegations regarding removal of his property from his cell by the Defendants.  (Id.)  Accordingly, any claims regarding Plaintiff's access to medical care following the October 14, 2008, use of force and any claims regarding Plaintiff's property being destroyed or disposed of should be dismissed.

**IV.     Defendants are entitled to summary judgment.**

Summary judgment is proper if the pleadings and sworn statements show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322-23 (1986).  The party moving for summary judgment bears the initial burden of demonstrating an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 323.  Upon meeting this burden, the burden shifts to the nonmoving party to present evidentiary material demonstrating that a genuine issue of material fact exists.  Id. at 324.

Applicable substantive law identifies those facts that are "material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual issues must have a real basis in the record to be considered genuine and the nonmoving party must show more than a "metaphysical doubt" regarding the material facts.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party.  Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

Although all reasonable inferences are made in favor of the nonmoving party, a court need not permit a case to go to a jury when the inferences drawn from the evidence and upon

which the nonmoving party relies are "implausible." Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U. S. 372, 380 (2007).  A mere "scintilla" of evidence in support of the nonmoving party's position is not sufficient; there must be evidence upon which a jury could reasonably find for the nonmoving party.  Anderson, 477 U.S. at 252.  See also Matsushita, 475 U.S. at 587 (stating that there is no genuine issue for trial if record taken as a whole would not lead a rational trier of fact to find in favor of non-moving party).  In other words, summary judgment is warranted against a nonmoving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Hearsay statements contained in an affidavit will not defeat a motion for summary judgment.  See Bozeman v. Orum, 422 F.3d 1265, 1267 n.1, n.2 (11th Cir. 2005) (the court cannot consider hearsay "in discerning the facts for summary judgment" purposes); Fed. R. Civ. P. 56(e) ("supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

The Eleventh Circuit has noted that some courts, including the Eleventh Circuit, have "restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form".  See Macuba v. DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999).  These phrases have developed from language appearing in the Supreme Court's decision in Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Id.  However, when courts use such phrases

"reduced to admissible evidence at trial" and "reduced to admissible form", they mean that the out-of-court statement made to the witness – i.e., the Rule 56(c) affiant or the deposition deponent – must be admissible at trial for some purpose.  <u>Id.</u>  "For example, the statement might be admissible because it falls within an exception to the hearsay rule, [note omitted] or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), [note omitted] or is used solely for impeachment purposes (and not as substantive evidence)."  <u>Macuba</u> at 1323-1324.

In <u>McMillian v. Johnson</u>, 88 F.3d 1573, 1584 (11th Cir. 1996),  the Eleventh Circuit clarified its earlier rulings on this point by indicating that their cases applying <u>Celotex</u> read <u>Celotex</u> "as simply allowing *otherwise admissible evidence* to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." However, the court was clear that "potential impeachment evidence [although admissible] . . . may not be used to create a genuine issue of material fact for trial" that would defeat a motion for summary judgment.  <u>McMillian</u>, 88 F.3d at 1584.

## V.    Plaintiff fails to establish an Eighth Amendment violation.

The unnecessary and wonton infliction of pain constitutes cruel and unusual punishment in violation of the Eighth Amendment.  <u>Whitley v. Alberts</u>, 475 U.S. 312, 319 (1986)(quoting <u>Ingraham v. Wright</u>, 430 U.S. 651, 670 (1977))(internal quotation omitted).

What constitutes an unnecessary and wonton infliction of pain "varies according to the nature of the alleged constitutional violation."  <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992)(citing Whitley, 473 U.S. at 320).  Under the cruel and unusual punishment standard, the Plaintiff must satisfy both the objective and subjective components.  Plaintiff must show that he objectively suffered a sufficiently serious deprivation and that each Defendant subjectively had a culpable

state of mind in allowing or causing Plaintiff's deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  In cases such as this where correctional officials use force on a prisoner, the subjective standard focuses on whether the force was applied in "a good faith effort to maintain or restore discipline and not maliciously or sadistically to cause harm."  Skrtich v. Thornton, 280 F. 3d 1295, 1300 (11th Cir. 2002)(quoting Whitley, 457 U.S. at 320-21).

Department rules provide that a corrections staff member is permitted to use force to defend himself or another against an inmate using unlawful force, to quell a disturbance and to overcome an inmate's physical resistance to lawful commands.   See Rule 33-602.210(1)(a),(e),(f), Florida Administrative Code.   Plaintiff's actions fit each of these categories:  Plaintiff attempted lunged at and attempted to head butt Officer Harris three times, necessitating a use of force to protect against further assault.  (Exhibits C, D, E, F, G and H)  In addition, throughout the escort from the quarterdeck and down the stairs, Plaintiff was being disruptive and disorderly, yelling obscenities and repeatedly trying to break free from Officer Christie and Officer Harris.  (Id.)  Further, Plaintiff repeatedly refused orders to cease his assaultive behavior and was physically resistant to the officers' commands when he twisted his upper body against the officers' holds and kept snatching away from their grasp.  (Id.)

Plaintiff, however, alleges that the Defendants "maliciously and sadistically" used cruel and unusual punishment against him to inflict physical harm, serious injury and severe physical pain on the Plaintiff.  (Doc. 28 at 8)  A variety of factors are considered in determining whether force was applied maliciously or sadistically: (a) the need for the application of force; (b) the relationship between the need and the amount of force used; (c) the extent of the injury inflicted upon the prisoner; (d) the extent of the threat to the safety of staff and inmates; and (e) any efforts made to temper the severity of the forceful response.  Cockrell v. Sparks, 510 F.3d 1307,

20

1311 (11th Cir. 2007)(citations omitted).  "From consideration of such factors, 'inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" Skrtich v. Thornton, 280 F.3d 1295, 1300-1301 (11th Cir. 2002).  "When considering these factors, we give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the time of a disturbance." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009)(per curiam).

In addition, the U.S. Supreme Court has recently reiterated that the *de minimus* nature of an inmate's injuries is not dispositive of an excessive force claim.  Wilkins v. Gaddy, 2010 WL 596513 at *1 (reaffirming decision in Hudson to decide excessive force cases on the nature of the force rather than the extent of the injury); Vicks v. Knight, No. 09-15012, 2010 WL 2079696 at *5 (11th Cir. May 26, 2010)(per curiam)(not selected for publication in the Federal Reporter).

Here, other than his unsupported allegations, Plaintiff has not established any wrongdoing by any of the Defendants.  Applying the factors outlined above demonstrates that no Eighth Amendment violation has occurred.

A.    *Application of the factors for determining "malicious or sadistic" application of force.*

1.    **The need for force**

Plaintiff is an inmate with a lengthy disciplinary history, including DRs for disorderly conduct, spoken threats, assault, disobeying orders, arson, and destruction of state property. (Exhibit A)  In addition, Plaintiff has a documented history, both prior to and following this incident, of getting out of or otherwise manipulating his restraints.  (Exhibit B)  Thus, when an inmate with this type of disciplinary history becomes disorderly during an escort and attempts to assault an officer three times, a spontaneous use of force is necessary in order to bring that

inmate under control.  (Exhibits D, E & K)  An inmate who attempts to assault an officer poses an immediate and substantial risk of harm to the safety of the surrounding officers, as well as other inmates in the area.  (Exhibits D & E)  An inmate who is repeatedly attempting to break an officer's custodial hold, is being physically resistant to an officer's orders, and who is yelling obscenities and otherwise being non-compliant poses a immediate danger to the escorting officers and the surrounding area.  (Id.)  When a potentially dangerous inmate attempts to assault a correctional officer and repeatedly attempts to break free of an officer's grasp, the officers not only should respond but they have a duty to respond in order to maintain the safety and security of the institution.  Moreover, when an inmate, particularly one with a history of manipulating his handcuffs, presents with an unknown slippery substance on his skin, which is a known tactic used by inmates who are trying to get out of their handcuffs, it creates an immediate risk of harm to staff, other inmates, and the institution as a whole.  (Exhibits D, E & J)

Therefore, when the Plaintiff, a potentially dangerous inmate with a lengthy disciplinary history, including several instances where he manipulated or broke free of his restraints[2], presented with a slippery substance on his hands up to his upper forearms, attempted to head butt an officer three times, and was being physically resistant to repeated commands to cease his behavior, Plaintiff created an instant need for an immediate response to the situation.  (Exhibits

---

[2] On October 30, 2007, Plaintiff slipped his right hand out of his handcuffs and assaulted another inmate with closed fist punches to the torso and head.  (Exhibit B at 1-2)  On June 25, 2008, York entered a recreation cage, manipulated his handcuffs from the back to the front, and then charged toward an officer and struck him in the upper torso with both of his clenched fists.  (Id. at 3-4)  Force was necessary to prevent further assault.  (Id.)

Since the use of force in question, York has continued this pattern of behavior.  On January 27, 2009, York pulled his left arm free of restraints and attempted to strike an officer in the face.  Force was necessary to prevent further assault.  (Id. at 5-6)  On April 28, 2009, York ran out of the programs room after receiving a shave, slipped out of his handcuffs and grabbed an inmate's leg, pushing him into the stairs.  (Id. at 7-8)  York kicked toward the other inmate and grasped him around his head.  (Id.)  Force became necessary to prevent further assault.  (Id.)  On December 14, 2009, York manipulated his left hand out of his restraints and manipulated his right hand to the front (although still cuffed), and then stabbed inmate Willie Lester three times in the chest.  (Exhibit B at 9-10; Exhibit E)

A, B, D, E, J & K)  The presence of a slippery substance on York's arms was indicative that he may be planning to try to get out of his handcuffs or otherwise manipulate his restraints, where he could then pose a risk of harm to staff and other inmates.  (Exhibits D, E & J)  It was necessary to use force to overcome York's resistance to Officer Harris and Officer Christie's commands and then to move him to a secure location in order to minimize the risk to the institution.  (Exhibits D & E)  York's assaultive and disorderly behavior was witnessed by Defendants Kelly and Nash and by Officer Robinson, who was present in the control room when the use of force occurred.  (Exhibits F, G & H)

A corrections staff member is permitted to use force to defend himself of herself or another against an inmate using unlawful force, to quell a disturbance and to overcome an inmate's physical resistance to lawful commands.  See § 944.35, Florida Statutes; Rule 33-602.210(2)(a), (e), (f), Fla. Admin. Code.  Whether the prison disturbance is a riot or a lesser disruption, the corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates.  Beard v. Green, 2010 WL 411084 at *3 (S.D. Fla. 2010); Hudson v. McMillian, supra (quoting Whitely, supra, at 321-22); Brown v. Smith, 813 F.2d 1187 (11th Cir. 1987).

Here, the spontaneous use of force by Officers Christie and Harris was appropriate and necessary to overcome Plaintiff's physical resistance to the escort and to minimize the risk of further assault on staff or other inmates.  (Exhibits D, E, F, G, H, J & K)  The force applied in this case, holding Plaintiff against a door and forcing him to the quarterdeck and landing floors, was reasonable and not excessive.  (Exhibits D, E, F, G, H & K)  Plaintiff alleges he was assaulted by staff in the conference room, yet there is no evidence to support his version of events.  The evidence in this case reflects that Plaintiff attempted to attack Officer Harris and

23

needed to be restrained by staff, and that he continued resisting staff and refused orders to cease his behavior.  (Id.)  Further, the evidence reflects that Plaintiff escalated the security threat by deliberately putting butter on his skin, which is a known tactic used by inmates to try to get out of restraints or evade an officer's hold.  (Exhibits C at 25-26, D, E, J, K & P)  Plaintiff's actions created an absolute need for a spontaneous use of force.

2.      **The relationship between the need and the amount of force used**

The forced used against Plaintiff in this case (holding him against the conference room door and forcing him to the floor) was in response to physical attacks by Plaintiff against Officer Harris, in response to aggressive statements, and in response to his repeated attempts to break the officers' hold by twisting his upper body and by forcefully snatching himself away from the officers.  (Exhibits D & E)  Verbal commands failed to bring Plaintiff into compliance long enough to complete escorting Plaintiff down the stairs and force was necessary to curtail his assaultive and aggressive actions.  (Id.)  The force used in grasping Plaintiff and holding him against the conference room door and forcing him to the ground were reasonable and necessary to stop his potentially assaultive behavior.

The spontaneous use of force was witnessed by Officer Nash, Officer Kelly, and Officer Robinson.  (Exhibits F, G & H)  All three witnesses stated that Officers Harris and Christie used only the minimum amount of force necessary to control the situation.  (Id.)  The application of the force was applied in a good faith effort to gain control of an inmate who was exhibiting disorderly and assaultive behavior and was trying to break the officers' hold by jerking and twisting his upper body and by forcefully snatching himself away.  (Id.)  Officers Harris, Christie, Nash, Kelly and Robinson all deny that anyone hit, kicked or otherwise assaulted Plaintiff during this incident.  (Exhibits D, E, F, G, & H)  Plaintiff was held against the door and

24

taken to the floor when he was non-compliant and physically resistant to the officers and was assisted to his feet each time he calmed down.  (Exhibits D & E)  This is not an example of excessive force that was applied maliciously or sadistically.

### 3.      The extent of the injury inflicted upon the prisoner

Following the use of force, Plaintiff was given a post use of force examination with the following injuries being noted: small scratches on right ankle from cuffs, small scratch on right wrist, multiple superficial scratches and lacerations to face with swelling, hematoma on forehead, swelling to right eye with inability to open on own, and two lacerations requiring sutures (one to the right crown and one to the left eyebrow).  (Exhibit M at 1-2)  Plaintiff received three sutures on each cut.  (Id.)  That Plaintiff, due to his own actions, suffered these injuries is unfortunate.  However, the infliction of pain in the course of a prison security measure does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.  Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998), citing Whitley v. Albers, 475 U.S. at 319.   "Not every push or shove, even it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).   Here, Officer Harris and Officer Christie's actions in grasping York, holding him against the conference room door, and forcing him to the quarterdeck and landing floors were reasonable given the circumstances:  Plaintiff repeatedly attempted to head butt Officer Harris, used profane and aggressive language, refused orders to cease his behavior and to stop resisting, repeatedly tried to break the officers' holds by twisting his upper body, and deliberately applied butter to his skin making it difficult for the

officers to maintain their holds and allowing Plaintiff to snatch himself away from their grasps. (Exhibits C at 25-26, D, E, F, G, H, J, K & P)

Additionally, when Plaintiff was at the top of the stairs, he took one step forward as if to comply with Officer Christie's order for him to walk downstairs, and then suddenly snatched away, breaking the officers' holds, and again lunged at Officer Harris and attempted to head butt him.  (Exhibits D & E)  Officer Christie tried to grab the Plaintiff, but he was able to snatch away again.  (Id.)  Plaintiff lost his balance and fell down the stairs, rolling to a stop on the top of the stairwell landing, lying on his stomach.  (Id.)  Plaintiff's movements were sudden enough that they caused both Officers Christie and Harris to lose their balance as well, although both were able to catch themselves on the railing and on the wall, respectively.  (Id.)  Plaintiff's fall down the stairs, which was caused by his own noncompliant behavior, no doubt contributed to the extent of his injuries.  (Exhibit K)  Further, the surface of the stairs is coated in a non-skid material, similar to sand paper, which also likely contributed to his injuries.  (Exhibit D)  Again, while the fact that he suffered any injuries is regrettable, but it does not in and of itself mean that the officers' actions amounted to cruel and unusual punishment.  Plaintiff could have avoided the majority of his injuries had he simply walked down the stairs as instructed.

An independent investigation by the Inspector General's office concluded that the force used in this case was reasonable and not excessive given the circumstances and concluded that there was no evidence to support Plaintiff's allegation of excessive force or abuse.  (Exhibit K)  The injuries Plaintiff suffered were determined to be consistent with the type and amount of force used, particularly in light of the fall down the stairs.[3]  (Id.)

---

[3] During this use of force, Plaintiff was taken to the floor, facedown, three times in an effort to regain and maintain control over him.  (Exhibits D & E)  Forcing an inmate facedown on the floor allows for greater control over the inmate, as an officer can kneel or lay on top of the inmate or otherwise pin him to the ground in order to prevent

Moreover, Plaintiff's allegation of being kicked in the face four or five times by Captain Chestnut is inconsistent with the medical record in this case.  Blunt force kicks to the face hard enough to knock a person out would generally cause fractures to the facial bones, such as the nose, eye socket, or cheekbone.  (Exhibit N)  While no x-rays were taken immediately following the October 14, 2008, use of force, Plaintiff's face was x-rayed on August 5, 2009, following a complaint of being hit in the left side of the face unrelated to the issues in this case.  (Exhibits N and M at 15-16)  The August 5, 2009, x-ray report evaluated York for the presence of fractures, bone displacement, or other osseous (bone) abnormalities.  (Id.)  The report reflects no bone or other abnormalities and notes only that York showed complete opacification of the left maxillary sinus.  (Id.)  This means that York's sinus cavity was opaque on the x-ray, which is indicative of sinusitis.  (Exhibit N)  If there was a prior facial fracture that went undiagnosed, there would be evidence of the injury on the August 2009 x-ray report.  (Id.)  There would be evidence of the continued healing of the injury and misalignment of the bones that were fractured.  (Id.)  In this case, the x-ray report shows no evidence of such healing or misalignment that would indicate a prior facial injury that would be consistent with the blunt force trauma of 4 to 5 kicks to the face.  (Id.)  Instead, Plaintiff's injuries following the use of force are consistent with the Defendants and Officer Robinson's version of the use of force.  (Exhibit K)

---

further assault.  Being cuffed or in leg irons does not prevent an inmate from striking an officer.  An inmate on his back or side can still kick, strike, spit on, bite or otherwise continue to assault an officer much more easily than if forced facedown.  In this case, taking the Plaintiff down three times was necessary because Plaintiff was repeatedly trying to head butt an officer and was being non-compliant with orders to cease his assaultive behavior.  When forced to the ground face first, it is expected that the inmate will sustain facial injuries.  On top of the takedowns to the floor, in this case, there is the added fall down the stairs that also likely contributed to Plaintiff's injuries, as he was unable to properly brace himself during a fall due to his restraints.

### 4.        The extent of the threat to safety of staff and inmates

Defendants Christie and Harris were asked to escort the Plaintiff downstairs while other inmates were being removed from their cells for Mental Health Group and other callouts. (Exhibit D)   York could have walked peacefully with the officers and avoided this entire incident.  Instead, Plaintiff's disruptive and dangerous behavior necessitated the use of force.

The threat perceived by Officers Harris and Christie is clear.  Plaintiff used profane and aggressive language toward Officer Harris and then attempted to head butt him multiple times. (Exhibits D, E, F, G, H and K)  In addition, Plaintiff forcefully tried to escape the officers' hold by twisting and jerking his upper body and snatching himself away from the officers.  (Id.) Further, Plaintiff had butter on his skin, making it difficult to maintain a hold on him.  (Exhibits C at 25-26; D, J, K & P)  This is a known tactic used by inmates to try to slip out of handcuffs or to evade an officer's grasp.  (Exhibits D, E & J)  The presence of such a slippery substance on an inmate's skin is considered a serious security threat.  (Exhibits D & E)  It is indicative of an inmate planning to get away from an officer's escort or to somehow manipulate his restraints, where he can then pose a danger to other inmates and staff.  (Id.)  Any time it is evident that an inmate may be planning to manipulate his restraints in this manner is necessary to immediately bring the inmate into compliance and move him to a secure location in order to minimize the security risk to the institution.  (Id.)

York, in particular, has a documented history of manipulating his restraints twice prior to this incident, demonstrating a pattern of behavior that the officers had a duty not to ignore. (Exhibit B)  No other conclusion can be drawn from Plaintiff's actions other than that this behavior and use of the butter on his skin was a threat to the safety and security of the institution.

Thus, the need for the spontaneous use of force was reasonably perceived by Defendants Christie and Harris.

### 5.     Efforts to temper the severity of the forceful response

As demonstrated by the statements provided by the Defendants and the witnesses, Plaintiff was verbally ordered to cease his disruptive and assaultive behavior several times throughout the use of force, thereby demonstrating staff's efforts to temper the forceful response. (Exhibits D, E, F, G & H)    After Plaintiff's initial attempt to head butt Officer Harris, he was held against the conference room door and ordered to cease his behavior, but Plaintiff ignored these orders and persisted in his assaultive and unruly behavior.  (Exhibits D & E)  Had Plaintiff simply stopped his assaultive behavior at the first order to do so, the majority of this incident could have been avoided.  Plaintiff's own actions escalated the incident.  Every time Plaintiff was ordered to stop resisting the officers, Plaintiff either refused or complied only long enough to be brought to his feet, at which point he would begin physically resisting Officers Christie and Harris again.  (Id.)  Officer Christie and Officer Harris' actions in grasping Plaintiff, holding him against the conference room door, and forcing him face down on the quarterdeck and landing floor were appropriate given these circumstances.  The force used against Plaintiff was justified, reasonable, necessary and constitutionally firm.

**B.     *Plaintiff's accounts of the incident are inconsistent with one another.***

Plaintiff has been inconsistent in his account of the incident at issue each time he has recounted his story.   These inconsistencies were found to be a compelling reason for the Inspector General's office to determine Plaintiff's allegations were unsubstantiated.  (Exhibit K) A similar consideration of Plaintiff's inconsistencies should be given here.

In his submitted written Witness Statement for the Report of Force Used investigation, Plaintiff stated that he was being taken off the wing by Officers Nash and Kelly between 8:00 and 9:20 p.m.  (Exhibit L)  Plaintiff further claimed in his statement that once out of camera view Officer Christie commented that York liked to write up civil cases on Lieutenant Chestnut.  (Id.) Plaintiff alleged they took him into the room where the Transitional Care call-outs take place and Officer Christie hit him in the head with his right hand, which had a radio in it.  (Id.)  Plaintiff then said Officer Nash kicked him to the floor where he was hit with radios by Sergeant Jenkins, Officer Nash, and Officer Christie until he blacked out.  (Id.)  York also said Sergeant Jenkins kicked him in the forehead.  (Id.)  Plaintiff did not mention Defendants Harris and Chestnut being involved in the incident at all.  (Id.)

In his formal grievance regarding the use of force, dated three days after the incident, Plaintiff stated that on October 14, 2008, at about 8:00 a.m. or 9:00 a.m., Officers Nash and Kelly told York he had a callout and pulled him from his cell.  (Exhibit Q)  As they reached the quarterdeck area in front of the control room, Officer Nash stated, "We have a surprise for you!" and smiled devilishly.  (Id.)  Plaintiff claimed Officer Christie then grabbed his shirt collar and said, "Oh, you like to file lawsuits against my coworkers, huh?"  (Id.)  Officer Christie then pushed York into an unlit room where psych interviews are held, slammed his radio into York's head, and pushed him against the wall causing him to fall face down on the floor.  (Id.)  York stated he was beaten by Officers Christie, Nash, Kelly, and others for five minutes before he was knocked out.  (Id.)  York later awoke in the sallyport with numerous facial injuries.  (Id.) Plaintiff did not mention being kicked in the head, nor did he mention Officer Harris, Captain Chestnut or Sergeant Jenkins being involved in the incident.  (Id.)  Plaintiff also changed the

alleged time of the incident, what Officer Nash stated to him, and Officer Christie's initial actions inside the psych interview room.  (Compare Exhibits L & Q)

In his sworn recorded interview with Inspector Snow, conducted on November 19, 2008, Plaintiff once again changes some of the details of the incident.  (Exhibit P)  Plaintiff stated that Officers Nash and Kelly escorted him off the wing for a psychology call-out, but when they got to the conference room door, Officer Christie opened the door, grabbed him by his collar, and threw him into the wall.  (Id.)  Plaintiff alleged that Officers Kelly, Christie and Nash then punched and hit him in the head with their radios for five minutes.  (Id.)  In this interview, however, York changes his story and asserts that it was Lieutenant Chestnut, rather that Sergeant Jenkins who came into the room and kicked him *once* in the forehead, which knocked him out. (Id.)  Plaintiff also said that the excessive force happened because he filed a lawsuit against staff and because he filed a formal grievance alleging that staff members in the dorm were going to set him up to get beaten.  (Id.)  Plaintiff initially denied that he placed any type of lubricant on his body, then changed his story and said that he did put grease on his hair, face and skin.  (Id.)

In his Amended Complaint, York once again has changed the details of his story. Plaintiff now claims that Officers Nash and Kelly were escorting him to his Mental Health Group, when Officer Nash smiled and said, "Don't worry.  You're not going very far," while he and Officer Kelly escorted Plaintiff off the wing.  (Doc. 28 at 9)  Once in the hallway, Plaintiff claims he saw Defendant Christie, who stated, "Hi York. I see your black ass likes filing grievances and lawsuits on my co-workers."  (Id.)  After being shoved in the vacant room by Officer Christie, Plaintiff claims he hit the wall and fell to the floor.  (Id. at 10)  Plaintiff alleges Defendants Harris, Nash, Kelly and Christie began kicking Plaintiff in the face, back and chest before taking turns punching and hitting him in the face with their radios.  (Id.)  This assault

went on for approximately 8 minutes.  (Id.)  Plaintiff then claims Captain Chestnut entered the room and kicked Plaintiff 4 or 5 times (opposed to the one kick to the face Plaintiff described to Inspector Snow) in the face until he blacked out.  (Id.)

In sworn deposition testimony taken in this case recently, York stated that he did make a mistake in initially including Sergeant Jenkins in his witness statement, and that he had him confused with Officer Harris.  (Exhibit C at 9-10)  However, in his initial statement York stated that Sergeant Jenkins was the one who kicked him in the head.  (Exhibit L)  Replacing his name with that of Officer Harris does not correct the inconsistency, as in all other versions of Plaintiff's story it was Lieutenant Chestnut, not Jenkins and not Harris, who kicked Plaintiff in the head.  (Exhibits C at 8; Exhibit P at 7; see also Doc. 28)  Each time Plaintiff has retold the story of what happened on October 14, 2008, the details have changed in terms of who exactly was using force on him and the amount and type of force used.  Plaintiff's version of the facts in this case is a constantly moving target that undermines his entire claim of physical abuse.

Further, in Plaintiff's most recent version of events Plaintiff tells a story that is completely implausible.  In his sworn deposition testimony, Plaintiff told substantially the same version of events as in his Amended Complaint, but he provided additional detail about the incident which renders one critical aspect of his story totally impossible.  Plaintiff stated that he was facing Officer Christie, with the conference room door to Plaintiff's right and Christie's left. (Exhibit C at   Plaintiff alleged that Officer Christie grabbed him behind his shirt collar with his left hand and then opened the conference room door with his right hand.  Plaintiff first stated the door knob was on the right side of the door, and then changed his testimony and stated it was on the left.  (Exhibit C at 22, 33, 34)  Either way, the door pulled open outwards, rather than pushing open inwards.  (Id. at 4)

A court need not permit a case to go to a jury when the inferences drawn from the evidence and upon which the nonmoving party relies are "implausible." Cuesta, supra at 10. To accept Plaintiff's claims as true requires the reader to believe that Officer Christie would have held York behind his collar with his left hand, while opening a door situated to his left that pulls open left to right with his right hand. This is all but physically impossible, as opening the door in this manner would force Officer Christie to have his arms crossed. Further, a door opened in this manner would have hit Officer Christie in the arm and would have prevented him from forcing Plaintiff into the conference room as alleged.[4] The impossibility of this sequence of events was pointed out to Plaintiff during the deposition, but he maintained that this was how the incident occurred, stating he didn't know how Officer Christie did it, but "[t]hat's what he did." (Exhibit C at 23-24)

**C.    *Plaintiff's allegations are unsupported by the evidence.***

There is simply no evidence to support Plaintiff's version of events and plaintiff's own sworn deposition testimony supports only a conclusion that the incident could not have occurred as claimed by Plaintiff. The participants in the use of force, Defendants Christie and Harris, and witnesses Defendants Kelly, Nash and Officer Robinson, all reported that the entire incident took place on the upstairs quarterdeck, the stairwell, and the landing, rather than in the upstairs conference room as Plaintiff alleges. (Exhibits D, E, F, G & H) Moreover, there is limited space in the upstairs conference room due to a table that takes up the majority of the room. (Exhibit I) It would be an "extremely tight fit for five officers to be assaulting an inmate in the open space

---

[4] Even assuming the doorknob is on the right side of the door, as Plaintiff first stated, and the door pulls outwards from right to left, the scenario is just as impossible. Officer Christie would have to take his right arm and reach under his left (going over his left arm that is still holding the 5'11'' Plaintiff behind the collar would make his right arm too high to reach a doorknob) and then reach across the door to the knob on the right side and pull it open. This again causes the door to physically impede Plaintiff's stated sequence of events.

between the right edge of the table and the right wall of the conference room," as Plaintiff alleges.  (Id.)  Such a tight fit that it would be improbable for such an assault to occur in that space.  (Id.)

     In addition, all witnesses reported that the force used on Plaintiff was the minimal amount needed to control his behavior.  (Exhibits F, G & H)  Similarly, there is no evidence to support Plaintiff's allegation that Officers Kelly and Nash participated in this incident in any way.  (Exhibits D, E, F, G, H & K)  All of the Defendants categorically deny Plaintiff's allegations in their entirety.  There is no evidence to support Plaintiff's allegation that Captain Chestnut was present during this use of force, or that she kicked Plaintiff in the face 4 or 5 times with such force that it rendered Plaintiff unconscious.  (Exhibits D, E, F, G, H J & K)  Captain Chestnut was not present and only arrived once Plaintiff was already in the downstairs holding cell.  (Exhibit J)  Further, the allegations against Defendant Chestnut are inconsistent with the medical evidence, as explained above.  (Exhibit N)

     Moreover, to accept the Plaintiff's allegations in this case requires belief in a vast conspiracy implicating too many people for it to be possible.  Accepting York's statements as true requires the reader to accept that York was forced into the conference room and was beaten for eight minutes by five different correctional officers, with the door to the conference room wide open, in direct view of Officer Robinson in the control room, who then lied about what she witnessed on the morning of October 14, 2008.  (Exhibits C, H & K; Doc. 28)  It requires the reader to accept that Officer Robinson and the five Defendants willfully falsified forms or records, and provided false testimony to Inspector Snow, and that they each lied in their affidavits or declarations provided for this motion, even though doing so is grounds for an employee's dismissal.  See Rule 33-208.003(21), Fla. Admin. Code.  It requires the reader to

accept that during those eight minutes, during which officers were busy pulling inmates from their cells for various callouts, not one person witnessed an eight-minute beating on an inmate taking place in a room with the door wide open.  And, not one person noticed an eight-minute absence of five correctional officers from their duties.  It requires the reader to accept that Defendant Chestnut told the doctor to "hide this inmate until he heals up," leading Dr. Aviles to keep Plaintiff overnight in the prison infirmary.  (Doc. 28 at 11)  It requires the reader to accept that other nurses and medical professionals who tended to the Plaintiff during that 24-hour time period are all complicit in the conspiracy to "hide" York's injuries.  (Exhibit M)  It requires the reader to accept that the Plaintiff was hiding in medical "until he heals up," yet on the day of his release from medical York was noted as having black and blue swollen eyes and a large hematoma on his forehead.  (Exhibit M at 9)  The following day, October 16, 2008, Plaintiff was noted as having black and blue eyes that were dilated and red, stitches in two places, and superficial scratches on his face.  (Id. at 12-13)  It is nonsensical that releasing Plaintiff in such condition could qualify as "hiding" his injuries.  It certainly stands to reason that with the swelling, stitches and bruising exhibited by the Plaintiff that if the Defendants were truly going to "hide" him in medical, it would have been for a much longer time period.

Plaintiff simply fails to establish **any** wrongdoing by the Defendants.  Defendants categorically deny Plaintiff's bald assertion that the Defendants forced him into the conference room and proceeded to hit, punch and kick him in the head and that Captain Chestnut kicked him 4 to 5 times in the face with such force that it rendered Plaintiff unconscious.  (Exhibits D, E, F, G & J)  Defendants further deny that any force was used beyond that which was required to restrain his assaultive actions and to maintain the safety and security of the institution.  (Id.)

Officer Robinson and subsequent investigation by the IG supported the Defendants' version of events.  (Exhibits H & K)

Plaintiff presented a serious security threat when he used aggressive and profane language against Officer Harris and tried to head butt him.  (Exhibits D & E)  The fact that Plaintiff was cuffed at the time of this incident does not minimize the security risk involved.  (Id.)  Even an inmate who is restrained at the hands or by leg irons is not prevented from inflicting harm.  (Id.)  Consequently, force was necessary to curtail his actions and to prevent further assault.  Moreover, Plaintiff continued to resist the grasp of Officers Christie and Harris by twisting his upper body in an attempt to break their hold on him and continued to be belligerent, yelling "Y'all gonna have to kill me" during the struggle.  (Exhibits D & E)

Most notably, at the beginning of this incident, while York was being held against the upstairs conference room door, Officer Christie discovered that York had an unknown slippery substance on his skin, which was later determined to be butter.  (Exhibit D & J)  The butter made is very difficult for the officers to maintain their hold on York and no doubt contributed to York's ability to snatch himself away from the officers.  (Exhibits D & E)  Inmates often apply slippery substances, such as butter, ointment, or soap to their skin in order to try to slip out of their handcuffs or to easily evade an officer's grasp.  (Exhibits D, E & J)  This practice creates a security threat to the institution and may be indicative of the inmate planning to get away from an officer's escort, where he can them pose a threat to other inmates or staff.  (Id.)

During his time in prison, York has displayed a pattern of behavior where he manipulates or gets out of his restraints.  (Exhibit B)  Twice prior to this incident, York was able to manipulate his handcuffs and then assault an inmate and an officer.  (Id. at 1-4)  Following this incident, York has on three occasions manipulated his restraints, including an incident on

December 14, 2009, where York manipulated his left hand out of his restraints and manipulated his right hand to the front (although still cuffed), and then stabbed inmate Willie Lester three times in the chest.   (Id. at 5-10)  These examples demonstrate that if it is evident that an inmate may be planning to manipulate his restraints, it is absolutely necessary to quickly bring the inmate into compliance and then move the inmate to a secure location to eliminate the security risk to the institution.  (Exhibits D & E)

An independent investigation by the Inspector General's office failed to find any evidence to substantiate Plaintiff's claims of being dragged into the upstairs conference room where he was subjected to excessive force or physical abuse by staff.  (Exhibit K)  The force used against Plaintiff by Officers Christie and Harris was only that needed to curtail his aggressive actions and gain control of the situation so he could be escorted to a holding cell. (Id.)

Throughout the investigation of this incident Plaintiff has failed to produce any evidence to corroborate his allegations because the incident never occurred.   Plaintiff's unsupported conclusory allegations are not plausible in the face of the record and are insufficient to withstand a motion for summary judgment.  Accordingly, Plaintiff cannot demonstrate an excessive use of force and the Defendants are entitled to summary judgment in their favor.

**IV.     Plaintiff fails to establish a retaliation claim.**

Plaintiff alleges that prior to the incident on October 14, 2008, he made several complaints "concerning staff misconduct."  (Doc. 28 at 9)  In addition, Plaintiff alleges that Defendant Christie stated prior to the alleged assault, "Hi York.  I see your black ass likes filing grievances and lawsuits on my co-workers."  (Id.)  Plaintiff appears to be alleging that his grievance writing and lawsuit filing on unspecified co-workers of the Defendants has resulted in

the use of force at issue.  However, his Amended Complaint is devoid of any specifics as to what grievances or lawsuits he has filed against whom or regarding what issue that allegedly led to the use of force.  (Id.)  Further, Plaintiff fails to explain how the Defendants in this case knew about these alleged grievances or lawsuits.  (Id.)  The only lawsuit filed with Captain Chestnut and Officer Harris named as Defendants was dismissed prior to it being served on anyone.  (Exhibit R)

A plaintiff in the Eleventh Circuit stating a retaliation claim must establish three elements: (1) that his speech or act was constitutionally protected; (2) that the defendant's retaliatory conduct adversely affected the protected speech or act; and (3) that there is a causal connection between the retaliatory actions and the adverse affect. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005)(citing Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005), and Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002)).

As to the first element, Defendants do not dispute that writing grievances or filing a lawsuit is constitutionally protected speech. Green v. Mowery, 212 Fed. Appx. 918, 919 (11th Cir. 2006); Redd v. Conway, 160 Fed. Appx. 858, 862 (11th Cir. 2005).  As to the second element, Plaintiff must show that the Defendants' actions resulted in something more than a "de minimis inconvenience" to the exercise of his First Amendment rights. Bethel v. Town of Loxley, 221 Fed. Appx. 812, 813 (11th Cir. 2006).

As to the third element, Plaintiff must demonstrate that a causal link exist between the alleged retaliatory act and his protected right.  Conclusory allegations of retaliation without a factual basis are insufficient. Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (An inmate can establish retaliation by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'").  Summary judgment

is appropriate when there is no evidence to suggest an affirmative causal connection between the retaliatory motive and any allegedly unconstitutional acts.  Harris v. Ostrout, 65 F.3d 912, 918 (11th Cir. 1995).   "[A] plaintiff must produce evidence of improper motive, rather than relying upon allegations, to defeat a summary judgment motion."  Smith v. Maschner, 899 F.2d 940, 947-48 (10th Cir. 1990).

In this case, Plaintiff makes absolutely no causal connection between the Defendants' alleged actions and any grievance he may have submitted or lawsuit he may have filed prior to October 14, 2008.  (Doc. 28)  His allegations amount to nothing more than speculation. Accordingly, Plaintiff's claim fails because no causal link is established between his protected right and any alleged retaliatory act and this claim must be denied.

## VII.  Plaintiff fails to demonstrate a need for court-appointed counsel.

In Plaintiff's request for relief, he asks to be appointed counsel.  (Doc. 28 at 14)  Plaintiff does not further explain why he believes he needs counsel anywhere in his Amended Complaint. (Doc. 28)  This request should be denied.  A district court has broad discretion under 28 U.S.C. § 1915(d) in deciding whether to appoint counsel for indigent litigants in civil cases.  Killian v. Holt, 166 F.3d 1156 (11th Cir. 1999).   Indigent civil litigants do not have a constitutional or statutory right to appointed counsel.  Bass v. Perrin, 170 F.3d 1712, 1720 (11th Cir. 1999).

In determining whether to appoint counsel, the district court typically considers, among other factors, the merits of the plaintiff's claim and whether the claim is factually or legally so complex as to warrant the assistance of counsel, Holt v. Ford, 862 F.2d 850, 853 (11th Cir. 1989), see also Bass, supra; Edgington v. Missouri Dept. of Corrections, 52 F.3d 777, 780 (8th Cir. 1995); Jackson v. Dallas Police Dept., 811 F.2d 260, 261-62 (5th Cir. 1986); Hodge v. Police Officers, 802 F.2d 58, 60-61 (2d Cir. 1986); Wilborn v. Escalderon, 789 F.2d 1328, 1331

(9th Cir. 1986); <u>Maclin v. Freake</u>, 650 F.2d 885, 887-88 (7th Cir. 1981)(per curiam); cf. <u>Caston v. Sears, Roebuck & Co.</u>, 556 F.2d 1305, 1309 (5th Cir. 1977)(merits of case is factor in determining if district court abused discretion in denying appointed counsel in a Title VII case).

Another consideration is whether the *pro se* litigant needs help in presenting the essential merits of his or her position to the court. <u>Kilgo v. Rick</u>, 983 F.2d 189, 193 (11th Cir. 1993).

> There is no automatic right to the appointment of counsel in a section 1983 case. <u>Wright v. Dallas County Sheriff Dept.</u>, 660 F.2d 623, 625-26 (5th Cir. 1981). A district court is not required to appoint counsel unless the case presents "exceptional circumstances." <u>Branch v. Cole</u>, 686 F.2d 265-266 (5th Cir. 1982). "The existence of such circumstances will turn on the quality of two basic factors – the type and complexity of the case, and the abilities of the individual bringing it." <u>Id.</u> at 266 (footnote omitted).

<u>Jackson v. Dallas Policy Dept.</u>, 811 F.2d 260, 261 (5th Cir. 1986).

A review of the complaint and filings by the parties reveals there are no exceptional circumstances that would merit appointment at this time. The facts alleged with regard to the incident are straightforward and known to Plaintiff, and he does not complain of any difficulties in litigating this case. Furthermore, Plaintiff has adequately presented his case to this point, including actively participating in discovery with the Defendants. As Plaintiff has failed to present any exceptional circumstances that would necessitate an appointment of counsel, this request should be denied at this time.

**VIII.    Plaintiff fails to demonstrate a need for injunctive relief.**

In his request for relief, Plaintiff seeks injunctive relief. (Doc. 28 at 14) Plaintiff does not state which Defendant he seeks injunctive relief from, nor does he state what type of injunction he is seeking. (<u>Id.</u>) To secure an injunction, a party must prove four elements: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) the

injury outweighs whatever damage an injunction may cause the opposing party; and (4) an injunction is not adverse to the public interest.  McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing Citizens for Police Accountability Comm. v. Browning, 572 F.3d 1213, 1217 (11th Cir. 2009)(per curiam)). The movant must clearly establish the burden of persuasion as to all four prerequisites. Id.  Here, Plaintiffs fails to demonstrate or even allege that he has met any of the factors necessary to merit injunctive relief of any kind in this case.  As Plaintiff has failed to adequately support his request for injunctive relief, the claim should be dismissed.

## CONCLUSION

Wherefore, based on the foregoing, Defendants Chestnut, Christie, Harris, Kelly and Nash respectfully request that Plaintiff's Amended Complaint be dismissed, or in the alternative, that summary judgment be entered in their favor.

Respectfully submitted,

**PAMELA JO BONDI**
**ATTORNEY GENERAL**
s/Jamie M. Braun
Jamie M. Braun
Assistant Attorney General
Florida Bar No. 0058871
Office of the Attorney General
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300 - Telephone
(850) 488-4872 - Facsimile
jamie.braun@myfloridalegal.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by U.S. Mail to: Herbert D. York, DC# B02769, Union Correctional Institution, 7819 N.W. 228th Street, Raiford, Florida, 32026-4000, on this 17th day of August, 2011.

s/Jamie M. Braun
Jamie M. Braun
