UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HERBERT D. YORK,

    Plaintiff,

v.                               Case No. 3:10-CV-920-J-32TEM

FELICIA D. CHESTNUT, et al.,

    Defendants.
_____/

### AFFIDAVIT OF PHILIP CHRISTIE

**STATE OF FLORIDA**
**COUNTY OF SUWANNEE**

    BEFORE ME, the undersigned authority, personally appeared **PHILIP CHRISTIE**, who first after being duly sworn says:

    1.    My name is Philip Christie and I am competent to testify to the facts stated in this affidavit. I have personal knowledge of these facts.

    2.    I am a Correctional Officer employed by the Florida Department of Corrections, and currently work at Suwannee Correctional Institution. During the time relevant to the complaint, I worked at Union Correctional Institution.

    3.    On October 14, 2008, I was assigned during the administrative shift, which at that time ran from 7 a.m. to 4 p.m., to work at O-dorm at Union CI. That morning, I was assisting in pulling inmates from their cells to be escorted to Mental Health Group and other callouts. At approximately 7:40 a.m., Officer Harris and I had just returned to the second floor from the downstairs of O-dorm, when Officers Kelly and Nash approached with inmate York and asked us to take York downstairs while they continued pulling inmates out of their cells. Before Officer Harris and I could even take over the escort, inmate York said, "Fuck you white boy" to Officer Harris and then attempted to head butt him. I pinned York against the upstairs conference room door and ordered him to cease his assaultive behavior. York refused and continued to struggle. York shouted, "I will kill all you fucking crackers!" Officer Harris then assisted me in holding York against the door. York continued to refuse orders to cease his resistance and again began twisting his upper body in an attempt to break our holds.

    4.    At this time, I attempted to grasp York's left hand, which was handcuffed in front. My hand slipped off of York's left hand, due to an unknown slippery substance present on his skin. The slippery substance was present up to York's upper forearms and was not sweat. As I

1



was unable to maintain my hold on York's left hand, I instead grasped York's left shoulder. York continued to resist by twisting his body, attempting to pull away from myself and Officer Harris.

5. York then attempted to head butt Officer Harris a second time. Officer Harris and I forced York to the quarterdeck floor, face down, in order to prevent further assault. York refused my order to cease his disruptive behavior. York continued to struggle and resist by twisting his upper body. Once York became compliant and was assisted to his feet, he again started resisting and twisting his body and began shouting, "Fuck y'all!" Officer Harris and I again forced York face down on the floor. Once York ceased his disruptive behavior, Officer Harris and I assisted York to his feet again.

6. Because York appeared compliant, I ordered York to walk down the stairs. York started forward as if to comply but suddenly snatched away and attempted to head butt Officer Harris a third time. I grasped York's upper left arm, but he snatched away again, apparently lost his balance and fell down the stairs, rolling to a stop on the top stairwell landing. York's sudden movements caused Officer Harris to lose his balance on the stairs as well, although he was able to brace himself against the wall directly opposite the stairs with his arms. I also lost my balance but was able to regain my balance by grabbing onto the upper rail. I then proceeded down to the first landing. Inmate York was positioned against the wall opposite the first set of stairs down to the landing and his head and part of his upper body were slightly down the next flight of stairs to the second landing below. Officer Harris and I then went partway down the second set of stairs and brought York to his feet on the first landing. The detail about Officer Harris and I losing our balance on the stairs is not in my incident report. At the time I wrote the report, the fact that Officer Harris and I also almost fell down to the landing did not seem important enough to be included in my report as I was more focused on documenting York's actions, the use of force, and our struggle to get him to a secure location.

7. While still on the top landing, York refused orders to walk down the rest of the stairs and stated, "Y'all are gonna have to kill me." York again tried to break free by twisting his upper body. Officer Harris and I forced York face down on the stairwell landing in order to regain control of him and prevent further assault. Once York finally became compliant, Officer Harris and I assisted him to his feet and escorted him to the bottom of the stairs. Once at the bottom of the stairs, I released my hold on inmate York. Officer Harris then escorted York to the O-dorm first-floor holding cell, placed York on the holding cell bench, and exited the holding cell. No further force was used.

8. I have never threatened or retaliated against York for any reason. I have not confiscated or destroyed any of York's personal records related to this incident or otherwise. At no time did I kick, hit, or punch York, nor have I ever hit him with my radio. I also did not observe any other staff members hit, punch, kick, or otherwise assault York, nor did I or anyone else force York inside the conference room during this incident. If I had observed any such actions, I would have reported it to the proper authorities. My actions in grasping York, holding him against the conference room door, and forcing him face down on the floor were necessary to prevent further assault on Officer Harris and to stop his continued aggressive and disorderly actions against me, Officer Harris, and the other inmates or officers who may have been present.

I used only the minimal amount of force necessary to control York's behavior.

9. York presented a serious security threat when he attempted to head butt Officer Harris and continuously refused orders to cease his assaultive and disruptive behavior. In my experience, restraints do not disable an inmate from inflicting harm on another officer or inmate. Even an inmate in hand restraints can strike with their head or body, kick, bite, spit, or grab with their hands. Leg irons do not prevent an inmate from kicking or striking an officer. It was necessary to force York to the quarterdeck and stairwell landing floor to gain control over him, to prevent further assault, and to maintain the safety and security of the unit. Taking an inmate to the floor facedown, rather than on his back or side, gives the officer greater control over the inmate and minimizes the potential for further assault by the inmate. An inmate on his back can still strike, bite, spit on or otherwise assault the officers involved in a use of force.

10. In this case, there was no need for additional officers to become involved in the use of force. The majority of the incident took place in the stairwell, which is narrow and measures approximately 3½ to 4 feet wide. The stairs are closed off by a wall on one side and there is an open railing that looks over the first floor on the left side. It is just wide enough for one officer to maneuver the stairs alongside an inmate. Any other officers would have to be in front or behind the inmate. Due to the size of the area, having additional officers present could create a serious risk of injury, especially if the inmate tries to push an officer over the railing.

11. In addition, the surface of the stairs in O-dorm where this incident occurred is coated with a non-skid material. It is rough to the touch, similar to sand paper, and likely accounted for many of York's injuries as he fell down the stairs and came to a stop face down on his stomach, and was also forced to the stairwell landing floor, face down, due to his continued attempts to break my and Officer Harris' hold on him.

12. During this incident, I discovered that York had an unknown slippery substance on his skin, which made it very difficult for me and Officer Harris to maintain our hold on him. A cup of butter was later found in York's cell. In my experience as a correctional officer, it has become common over the last several years for inmates to use butter or other oily, slippery substances on their skin to help them slip out of handcuffs or to easily snatch away from an officer's hold. This is considered a serious security threat. It is indicative of the inmate planning to get away from an officer's escort or to somehow manipulate his restraints, where he can then pose a danger to other inmates and staff. Any time it is evident that an inmate may be planning to manipulate his restraints it is necessary to bring the inmate into compliance as soon as possible

3

and then move the inmate to a secure location to eliminate the security risk to the institution.

FURTHER AFFIANT SAYETH NAUGHT.

*[signature]*
PHILIP CHRISTIE
Affiant

Sworn to and subscribed before me this 17 day of August 2011.

*[signature]*
(Signature of Notary Public, State of Florida)

ROBIN RAE WILLIAMS
MY COMMISSION # DD 948359
EXPIRES: January 23, 2014
Bonded Thru Budget Notary Services

Print, type of stamp commissioned name of notary public

Personally known ___ or Produced identification ✓ (type of identification FL DL Employee ID)

4